UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | | |
| v. | ) | No. | 3:22-CR-84-RGJ |
| | ) | | |
| | ) | | 18 U.S.C. § 242 |
| BRETT HANKISON, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## UNITED STATES' TRIAL BRIEF

The United States respectfully submits this trial brief pursuant to the Court's Third Amended Pretrial Order, ECF No. 39.

## BACKGROUND

The defendant, former Louisville Metro Police Department (LMPD) Detective Brett Hankison, is charged with willfully violating the constitutional rights of Breonna Taylor; her boyfriend, K.W.; and her neighbors, C.N., C.E., and their young child, Z.F; by shooting blindly into Ms. Taylor's apartment during the execution of a search warrant on March 13, 2020.  Indictment, ECF No. 1.  The Indictment charges the defendant with two counts: (1) willfully violating the Fourth Amendment rights of Ms. Taylor and K.W. by shooting through a bedroom window that was covered with blinds and a blackout curtain; and (2) willfully violating the Fourteenth Amendment rights of Ms. Taylor's neighbors by shooting through a covered sliding glass door to Ms. Taylor's apartment, sending bullets into the neighboring apartment through a shared wall and nearly hitting C.N., C.E., and their young child, Z.F.  Trial is set to begin on October 30, 2023.

## I.    Statute and Elements

Both counts of the indictment charge the defendant with violating 18 U.S.C. § 242, which makes it a crime for a defendant acting under color of law to willfully deprive a person of a right protected by the Constitution or federal law.  To establish a violation of Section 242 in this case, the government must prove four elements:

First:      That the defendant acted under color of law;

Second:     That the defendant deprived a victim of a Constitutional right.  For Count One, the right is Ms. Taylor and K.W.'s Fourth Amendment right to be free from unreasonable seizures, which includes the right to be free from a police officer's use of unreasonable force.  For Count Two, the right is C.N., C.E., and Z.F.'s right to be free from the deprivation of liberty without due process of law, which includes the right to be free from a police officer's use of unjustified force that shocks the conscience.

Third:      That the defendant acted willfully; and,

Fourth:     That the offense involved either (1) the use of a dangerous weapon or (2) an attempt to kill.

*United States v. Lanier*, 520 U.S. 259, 264 (1997) (setting forth elements of 18 U.S.C. § 242).

### A.  Color of law

The first element the United States must prove with respect to each count is that the defendant acted "under color of law."  A police officer acts under color of law if he is performing his official duties, purporting to perform those duties, or giving the appearance of performing those duties, even if he misuses or abuses his official authority by doing something the law forbids.  *See Screws v. United States*, 325 U.S. 91, 111 (1948) ("It is clear that under 'color' of law means under 'pretense' of law . . . . Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it."); *West v. Atkins*, 487 U.S. 42, 49–50 (1988) ("It is firmly established that a defendant . . . acts under color of state law when he abuses

the position given to him by the State.  Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.").

### B.  Deprivation of a constitutional right

The second element the United States must prove is that the defendant deprived a person of a constitutional right.  Section 242 is not a source of any substantive rights, but rather serves as a vehicle for punishing violations of rights "made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them."  *Screws*, 325 U.S. at 104.  In this case, each count of the indictment charges the defendant with violating a different constitutional provision.

**Count One** charges the defendant with violating Ms. Taylor and K.W.'s Fourth Amendment right to be free from unreasonable seizures, which includes the right to be free from a police officer's use of unreasonable force.  A seizure occurs if a law enforcement officer intentionally restrains someone's freedom of movement either by force or by a show of authority, and it includes restraining someone by firing a weapon at them.  *See Thompson v. City of Lebanon*, 831 F.3d 366, 371 (6th Cir. 2016); *Ingram v. City of Columbus*, 185 F.3d 579, 591 (6th Cir. 1999).  Ms. Taylor and K.W. were seized when LMPD officers fired their service weapons at them from the doorway of Ms. Taylor's apartment, and they remained seized as the defendant fired at them through a bedroom window.  *See Cummin v. North*, 731 F. App'x 465, 471 (6th Cir. 2018) (once an individual has been seized, the "seizure 'continues throughout the time the person remains in the custody of the arresting officers'") (quoting *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988)).

The defendant's use of force violates the Fourth Amendment if it is objectively unreasonable under the totality of the circumstances. *Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 (2021) ("In assessing a claim of excessive force, courts ask whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."); *Cnty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546–47 (2017) ("The operative question in excessive force cases is whether the totality of the circumstances justifies a particular sort of search or seizure. The reasonableness of the use of force is evaluated under an objective inquiry that pays careful attention to the facts and circumstances of each particular case."). Force is unreasonable where it exceeds the objective need to use such force to accomplish legitimate law enforcement objectives. In addition, a police officer may use deadly force only when it is reasonably necessary to protect himself or someone else from an imminent threat of death or serious bodily harm. *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019) (deadly force is authorized only "in rare instances" where an "officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others") (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).

A police officer's use of force—including deadly force—must be objectively reasonable at the moment it was used. Force that is objectively reasonable at the beginning of an encounter may not be justified—even seconds later—if the objective justification for the initial use of force has been eliminated. *See, e.g.*, *Smith v. Finkley*, 10 F.4th 725, 748 (7th Cir. 2021) ("Threats can diminish, and resistance can decrease. If those conditions have curtailed, a reasonable officer may not conclude that in these circumstances it was lawful to use deadly force. An exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased. This court has cautioned that when an officer faces a situation in which he could

justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.") (internal quotations, citations, and alterations omitted); *Jones v. Treubig*, 963 F.3d 214, 236 (2d Cir. 2020) (holding that it was clearly established that, under the Fourth Amendment, the reasonableness of the amount of force used is assessed at the moment the force is used); *Amador v. Vasquez*, 961 F.3d 721, 730 (5th Cir. 2020) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of the force has ceased.").

**Count Two** alleges that the defendant deprived Breonna Taylor's neighbors, C.N., C.E., and. Z.N., of their right to be free from deprivation of liberty without due process, which includes the right to be free from a police officer's use of unjustified force that shocks the conscience. Unlike Ms. Taylor and K.W., the neighbors were not "seized" during the defendant's shooting because the "governmentally caused termination" of their "freedom of movement" was not "through means intentionally applied." *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (holding that a seizure occurs when an officer terminates freedom of movement through means intentionally applied). Instead, the restraint on the neighbors' freedom of movement was an unintended consequence of the shots directed at Ms. Taylor and K.W.[1] For that reason, the constitutional deprivation alleged in Count Two is not a violation of the Fourth Amendment, but rather of the Fourteenth Amendment's Due Process Clause.

A police officer's use of force may shock the conscience in violation of the Fourteenth Amendment if it is motivated by an intent to harm, punish, or retaliate in a manner that is unrelated to a legitimate law enforcement purpose. *See Lewis*, 523 U.S. at 846, 848 (holding that "conduct

---

[1] When the defendant fired five shots through the sliding glass door leading to Ms. Taylor's living room, bullets traveled through the walls of her apartment, entered the adjacent apartment, and nearly hit C.N., C.E., and their young child.

intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level"); *Jones v. Byrnes*, 585 F.3d 971, 976 (6th Cir. 2009) ("[A]ctions that can be said to shock the conscience are those that are motivated by an 'intent to harm suspects physically or to worsen their legal plight' in a manner unrelated to the legitimate object of arrest.") (quoting *Lewis*, 523 U.S. at 854)).

### C. Willfulness

The third element the United States must prove with respect to each count is that the defendant acted willfully.  A person acts willfully if he acts voluntarily and intentionally with the specific intent to do something the law forbids.  In this case, it means that the defendant used force knowing that the force he used was unjustified.  To prove that the defendant acted willfully, it is not necessary for the government to prove that the defendant knew that he was violating a specific law or constitutional provision.  Indeed, a defendant may act willfully even where he has no real familiarity with the Constitution or with the constitutional right involved, so long as he intended to use more force than was reasonable under the circumstances.  *United States v. Couch*, 1995 WL 369318, at *4 (6th Cir. 1995) ("As long as the accused specifically intends to use more force than is reasonable under the circumstances, he acts willfully and thus runs afoul of § 242."); *Screws*, 325 U.S. at 106 ("The fact that the defendants may not have been thinking in constitutional terms is not material where their aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution.  When they so act they at least act in reckless disregard of constitutional prohibitions or guarantees.").

**D. Dangerous weapon or attempt to kill**

The final element that the government must prove with respect to each count is that the offense involved the use of a dangerous weapon or an attempt to kill. Each count charges both that the offense involved the use of a dangerous weapon and that the offense involved an attempt to kill.

A "dangerous weapon" is any instrument capable of inflicting death or serious bodily injury, including extreme physical pain. The weapon need not actually cause any injury, as long as it is used in a manner capable of inflicting serious bodily injury or death. *See, e.g.*, U.S.S.G. 1B1.1., comment n.1(E) (defining a dangerous weapon as "an instrument capable of inflicting death or serious bodily injury").

An offense involves an "attempt to kill" where the defendant (1) intended to kill a person, and (2) took some overt act that was a substantial step towards killing a person. *See* Sixth Cir. Pattern Jur. Instr. 5.01 (2023).

The jury need not find the defendant guilty of both of these factors; for each count, proof beyond a reasonable doubt of either one of these factors is enough to prove the final element. However, to return a guilty verdict, the jury must agree unanimously that the same factor has been proven for each count. In other words, for each count, the jury must unanimously agree that the offense involved the use of a dangerous weapon *or* unanimously agree that the offense involved an attempt to kill. Additionally, the dangerous weapon and "attempt to kill" factors authorize different maximum penalties—10 years for dangerous weapon, life in prison for attempt to kill—and therefore must be found unanimously by the jury under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Accordingly, the United States respectfully asks the Court to use a special verdict form that

7

allows the jury to indicate its decision on the dangerous weapon and attempt to kill factors. The United States has included such a special verdict form in its proposed jury instructions.

## II.    Statement of Undisputed and Disputed Facts

### Undisputed Facts

The parties agree that the following facts are undisputed.

### A.  3003 Springfield Drive, Apartments 3 and 4

1. There is an apartment building located at 3003 Springfield Drive in Louisville, Kentucky.

2. The apartment is in the Western District of Kentucky.

3. The 3003 Springfield Drive building is an apartment building within a larger apartment complex.

4. The 3003 Springfield Drive building has four apartment units downstairs and four apartment units upstairs.

5. The apartment units within the 3003 Springfield Drive building are attached; they are not freestanding structures.

6. The entrance to all four downstairs apartment units is in a common, covered entryway that opens to the parking lot.

7. Apartment 3 and Apartment 4 are each two-bedroom apartments that are next to each other on the ground floor of the 3003 Springfield Drive apartment building.

8. The exterior of the building is made of brick and siding.

9. Along the side of Apartment 4, facing the parking lot, was a sliding glass door leading to the living area of the apartment and glass windows leading to two bedrooms.

### B.  Breonna Taylor and Her Sister, J.P.

10. In March 2020, Breonna Taylor lived in Apartment 4 with her younger sister, J.P.

11. Breonna Taylor was a woman from Louisville, Kentucky, who was 26 years old at the time of her death.

12. J.P. was not present in Apartment 4 on the night of March 12–13, 2020.

## C. K.W.

13. On March 13, 2020, K.W. was a 28-year-old man.

14. At times, K.W. stayed in Apartment 4 with Ms. Taylor and her sister.

15. On March 12–13, 2020, K.W. was staying with Ms. Taylor in Apartment 4.

## D. Neighbors C.N. and C.E.

16. On March 13, 2020, C.N. was a 24-year-old woman.

17. C.N. was seven months pregnant at the time.

18. On March 13, 2020, C.E. was a 28-year-old man.

19. C.E. and C.N. had a personal relationship, and C.E. was the father of C.N.'s unborn child.

20. On March 13, 2020, C.N. and C.E. lived in Apartment 3 with C.N.'s 3-year-old son.

## E. Defendant Brett Hankison

21. On March 13, 2020, defendant Brett Hankison was a Louisville Metro Police Department (LMPD) Detective.

22. As of March 13, 2020, the defendant had worked at LMPD for approximately 17 years.

## F. Firearms trainings

23. During his 17-year career at LMPD, the defendant qualified on his department-issued service weapon twice annually and completed firearms trainings that covered the rules governing officers' use of deadly force.

24. As part of his firearms trainings, the defendant was taught that, before discharging a firearm, an officer must reasonably perceive an imminent threat to human life or serious bodily injury.

25. As part of his firearms trainings, the defendant was taught that, before discharging a firearm, an officer must identify a target.

## G. March 12–13, 2020

26. On March 12, 2020, LMPD's Place-Based Investigations Unit (PBI) obtained warrants to search five properties as part of a narcotics investigation.

27. These properties included Apartment 4, which was approximately 10 miles away from the other four properties to be searched.

28. The defendant was not involved in the underlying narcotics investigation or the preparation of the affidavits to obtain the search warrants.

### *Apartment 4 Search Warrant Briefing*

29. On March 13, 2020, PBI officers held a briefing for the officers who were assigned to execute the search warrant at Apartment 4.

30. During the briefing, PBI officers described Apartment 4 as a "soft target."

31. During the briefing, PBI officers stated that they believed Breonna Taylor would be the only person present in Apartment 4 when the warrant was executed.

32. Although the warrant for Apartment 4 had been sworn out as a no-knock warrant, during the briefing, PBI officers instructed the officers executing the warrant to knock and announce.

### *Officers Assigned to Execute the Apartment 4 Search Warrant*

33. One PBI officer and six officers from the Criminal Interdiction Division were assigned to execute the Apartment 4 search warrant.

34. Seven LMPD officers executed the search warrant at Apartment 4 at approximately 12:45 a.m. on March 13, 2020.

10

35. The seven LMPD officers who executed the Apartment 4 search warrant were: (1) Lieutenant S.H., (2) Sergeant J.M., (3) Detective M.C., (4) Detective M.N., (5) Detective T.J., (6) Detective M.C., and (7) the defendant.

36. When officers attempted to execute the Apartment 4 search warrant, the defendant was on duty, wearing a vest that read "police" across his chest, and carrying a department-issued firearm.

### *Occupants in Apartments 4 and 3*

37. On the evening of March 12–13, two people—K.W. and Breonna Taylor—were present inside Apartment 4.

38. On the evening of March 12–13, three people—C.N., C.E., and their child—were present inside Apartment 3.

### *The shooting*

39. Officers knocked multiple times on the door.

40. After the officers knocked, Det. M.N. used the ram to hit the right side of the door, near the door handle, to force open the door to Apartment 4 open.

41. The exterior door to Apartment 4 opened.

42. The exterior doorway led to the entryway, living room, dining room, and kitchen of Ms. Taylor's home.

43. Beyond the living area, an approximately 30-foot hallway led to Ms. Taylor's bedroom, which was at the far end of the hallway on the right.

44. When the exterior door to Apartment 4 swung open, Sgt. J.M. stepped into the middle of the doorway as the first officer to enter the apartment.

45. When the exterior door swung open, Ms. Taylor and K.W. were at the end of the approximately 30-foot hallway.

46. When the exterior door swung open, K.W. immediately fired one shot with a handgun in the direction of the front door.

47. The bullet from K.W.'s handgun struck Sgt. J.M. in the leg.

48. K.W.'s handgun was lawfully registered to him.

49. Sgt. J.M. fired six shots into the apartment. Two of Sgt. J.M.'s shots hit Ms. Taylor.

50. As Sgt. J.M. went to the ground, Det. M.C. stepped in front of him and into the doorway of Apartment 4.

51. Det. M.C. fired 16 rounds into the apartment from the doorway.

52. At least three of Det. M.C.'s bullets struck Ms. Taylor.

53. One of Det. M.C.'s bullets caused Ms. Taylor's death.

54. At some point after officers breached the door to Apartment 4, the defendant moved from the common entryway to the parking lot side of Apartment 4.

55. The defendant fired five rounds through the sliding glass door on the parking lot side of Ms. Taylor's apartment, which led to Ms. Taylor's living room and kitchen.

56. When the defendant fired, the sliding glass door had vertical, hanging plastic blinds and a curtain.

57. Three of the bullets the defendant fired into the sliding glass door went through a wall in Apartment 4 and into Apartment 3.

58. The defendant then fired five rounds into Apartment 4 through the window on the parking lot side of Ms. Taylor's apartment, which led to her sister's bedroom.

59. When the defendant fired, the bedroom window had horizontal, hanging plastic blinds and a curtain.

60. The bullets from the defendant's shots through the bedroom window traveled through J.P.'s bedroom and across the back of the 30-foot hallway in Apartment 4, near the entrance to Ms. Taylor's bedroom.

61. At the time of the defendant's shots, Ms. Taylor was at the back of the 30-foot hallway, near the entrance to her bedroom.

62. In total, the defendant fired 10 rounds into Ms. Taylor's apartment from his LMPD-issued handgun. The defendant's bullets did not strike anyone.

63. In total, LMPD officers fired 32 rounds into Taylor's apartment from their LMPD-issued handguns.

### SWAT arrived on scene

64. SWAT and other officers responded to the scene of the shooting.

65. When SWAT officers arrived, they cleared Apartment 4.

66. SWAT officers located a 9-mm handgun under the bed in J.P.'s room.

67. The 9-mm handgun was registered to K.W.

68. Inspection of the 9-mm handgun showed that it had fired one round.

69. After SWAT officers cleared the apartment, and while they were holding secure the active crime scene, the defendant approached the door to Apartment 4.

70. The defendant asked SWAT officers inside of Apartment 4, "Is anybody in here dead?"

### The search of Apartment 4

71. Later that night, LMPD's Public Integrity Unit (PIU) searched Apartment 4.

72. K.W.'s 9-mm handgun was the only weapon recovered from inside of Apartment 4.

## Disputed Facts

The government anticipates that the following facts will be disputed at trial.

1. The training the defendant received about when officers are permitted to use deadly force.

2. How LMPD officers lined up and executed the search warrant at 3003 Springfield Drive, including whether and how officers announced their

presence before breaching the door to Apartment 4 to execute the search warrant.

3. The actions of Kenneth Walker and Breonna Taylor inside Apartment 4 in the moments before the shooting.

4. What Walker and Taylor knew and perceived at the moment officers breached the door of Apartment 4 and Mr. Walker fired his handgun.

5. The defendant's physical location during the incident, including how the defendant approached Apartment 4, where the defendant lined up in the stack, and where he was positioned when officers breached the door, when Mr. Walker fired his weapon, and when Sgt. Mattingly, Det. Cosgrove, and the defendant fired into the apartment.

6. The timing of the shots the defendant fired into Apartment 4.

7. The positioning and actions of the other six LMPD officers at the moment the defendant fired into Apartment 4.

8. What the defendant knew and perceived at the moment he fired into Apartment 4.

9. Why the defendant shot into Apartment 4.

10. The defendant's words and actions on the night of March 13, 2020, following the shooting.

### III.    Anticipated Substantive Issues of Law

The United States does not anticipate any substantive issues of law.

### IV.    Anticipated Evidentiary Issues

As the Court is aware, the parties have filed several motions *in limine*. *See* ECF No. 49 (Motion to prohibit improper references to the victims' civil lawsuits and settlements); ECF No. 50 (Motion to prohibit argument about a party's failure to call equally available witnesses); ECF No. 51 (Motion to preclude references to the defendant's prosecution by the Commonwealth of

Kentucky); and ECF No. 52 (Motion to exclude references to irrelevant rifle shell casings).  In addition to the matters raised in those motions, the United States anticipates that the following evidentiary issues may arise during trial.

### A. Recordings of 911 calls made shortly after the defendant's shooting are admissible.

At trial the United States expects to introduce recordings of 911 calls that were placed shortly after the defendant's shooting, including calls placed by two victims from inside the apartment homes that the defendant fired into: (1) a call placed by K.W. as he sat next to his girlfriend, Breonna Taylor, shortly after she was fatally shot; and (2) a call placed by Ms. Taylor's neighbor, C.N., moments after she awoke to gunfire as the defendant's bullets traveled through the walls of her apartment.  Recordings of both calls constitute admissible evidence, as the statements made on the calls fit within exceptions to the hearsay rule for excited utterances and present sense impressions and do not constitute "testimonial" statements that implicate the Confrontation Clause.

### 1. The 911 calls are admissible under the Federal Rules of Evidence.

The 911 calls are admissible under two well-established hearsay exceptions: they are present sense impressions, Fed. R. Evid. 803(1), and excited utterances, Fed. R. Evid. 803(2).  Courts regularly invoke these provisions to admit 911 recordings. *See, e.g.*, *Navarette v. California*, 572 U.S. 393, 400 (2014) ("911 calls that would otherwise be inadmissible hearsay have often been admitted" as present sense impressions and excited utterances.). Indeed, 911 calls placed shortly after an event "have long been treated as especially reliable" under the hearsay rules. *Id*, at 399. This reliability flows from the contemporaneous nature of most 911 calls, including the calls from K.W. and C.N., which "describe current circumstances requiring police assistance." *Davis*, 547 U.S. at 826; *see also United States v. Davis*, 577 F.3d 660 (6th Cir. 2009) (district court properly

found that a 911 call made shortly after a witness observed a person with a gun was a present sense impression and an excited utterance); *United States v. Arnold*, 486 F.3d 177, 185–86 (6th Cir. 2007) (911 call placed by a victim who ran out of a house and got into a car constituted an excited utterance); *United States v. Dean*, 823 F.3d 422, 427 (8th Cir. 2016) (victim's 911 call placed from a nearby store seven minutes after an incident was an admissible present sense impression); *United States v. Boyce*, 742 F.3d 792, 797 (7th Cir. 2014) (911 call placed after victim ran to her neighbor's house constituted an excited utterance); *United States v. Shoup*, 476 F.3d 38, 42 (1st Cir. 2007) (call placed after leaving dangerous location and going into nearby apartment admissible as present sense impression and excited utterance).

The 911 calls in this case fit comfortably within these precedents. Both calls were placed within minutes of the defendant's shooting, narrate events in the present tense, and seek immediate help in response to an ongoing emergency. For example, K.W. desperately pleaded with the 911 operator: "I don't know what is happening. Someone kicked in the door at my girlfriend's . . . oh my God . . . she's on the ground right now . . . help! Oh my God!" These and other statements made during the calls are excited utterances and present sense impressions. *See, e.g.*, *Arnold*, 486 F.3d at 192 (admitting 911 calls that began with "a present tense plea for help").

### 2. The 911 calls are not testimonial statements subject to the Confrontation Clause.

Admitting the recordings of the 911 calls is also consistent with the Sixth Amendment's Confrontation Clause, which guarantees the opportunity to cross examine any declarants who offers testimonial statements against a defendant. *See Crawford v. Washington*, 541 U.S. 36 (2004). However, nontestimonial statements—like the 911 calls at issue here—are not subject to Confrontation requirements. *Id*. at 68. do not encompass 911 calls made during or shortly after a

crime that seek immediate assistance from the police. *See United States v. Halteh*, 224 F. App'x. 210, 216 (4th Cir. 2007) (a "911 call . . . is admissible over a Confrontation Clause challenge, because it is considered nontestimonial") (citing *Davis v. Washington*, 547 U.S. 813, 828–29 (2006)). The primary purpose of both victim 911 calls in this case was "to enable police assistance to meet an ongoing emergency" rather than to "prove past events potentially relevant to later criminal prosecutions." *Davis*, 547 U.S. at 822; *see also id*. at 827 ("A 911 call . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance."). Both calls were made shortly after the defendant's shooting, and each lasts less than two and a half minutes. The callers emotionally describe the nature of the emergency and provide information to assist an effective law enforcement and emergency medical response to an unfolding incident. *See Davis*, 547 U.S. at 827 (statements made in response to 911 operator's "effort to establish the identity of the assailant" were nontestimonial because they related to "resolv[ing] the present emergency"); *Arnold*, 486 F.3d at 192 (911 call made to report a suspect with a gun was non-testimonial and admissible). The 911 calls here are nontestimonial for the same reasons.

### B. Limitations on character evidence.

It is a common defense strategy in federal color of law prosecutions to contrast the defendant's purportedly good character as a law enforcement officer with purportedly unsavory aspects of the victims' character. The Federal Rules of Evidence governing character evidence sharply limit such tactics. Although the government has no indication that the defense intends to pursue such tactics in this case, the rules governing character evidence are summarized below.

First, the defendant may not introduce evidence of his own good character to prove that he acted in conformity with his character during the shooting charged in the indictment.  *See* Fed. R. Evid. 404.  Rather, he may offer his own character only with respect to a "pertinent" character trait, and even then, he may elicit this evidence only in the form of reputation or opinion testimony—not through evidence of specific good acts the defendant has performed.  Fed. R. Evid. 404 & 405(a).

Second, the defendant should not be permitted to introduce character evidence related to the victims in this case.  This evidence is not relevant because the victims' character was not known to the defendant at the time of the shooting, and it therefore could not have influenced his decision to fire his weapon through the windows of Ms. Taylor's home.  If evidence of a victim's character were somehow relevant, the form of this evidence would likewise be limited to reputation or opinion testimony—not evidence of specific bad acts that any victim purportedly committed.  Fed. R. Evid. 404 and 405(a).

### 1. Evidence of the defendant's character must be limited to reputation or opinion testimony about pertinent traits—not specific good acts.

The Federal Rules of Evidence prohibit the defendant from presenting evidence or making argument about the defendant's specific good acts, including the defendant's good deeds, awards, commendations, or other good performance during his employment as a law enforcement officer.

As an initial matter, Federal Rule of Evidence 404 generally prohibits the introduction of evidence of a person's character to prove that the person acted in conformity with that character.  *See* Fed. R. Evid. 404(a)(1) & (b)(1).  While a defendant may offer evidence of a "pertinent" character trait[2] through "testimony as to reputation or by testimony in the form of an opinion," *see*

---

[2]  Several circuit courts have found that a defendant's "law-abiding character" is pertinent, *see, e.g.*, *United States v. De Leon*, 728 F.3d 500, 505 (5th Cir. 2013).  However, the defendant does

Fed. R. Evid. 404 & 405(a), specific instances of conduct are inadmissible as character evidence, except in cases—unlike this one—"in which character or a trait of character of a person is an essential element of a charge, claim, or defense," Fed. R. Evid. 405(b); see also Fed. R. Evid. 405 & nts. (noting that "specific instances of conduct" have "the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time").[3]

Moreover, should the defendant put his character at issue, Rule 404(a) provides that, "the prosecutor may offer evidence to rebut it." Fed. R. Evid. 404(a)(2)(A). Additionally, if the defense chooses to elicit reputation or opinion testimony about the defendant's character, the government may then cross-examine the witnesses on relevant specific instances of the defendant's conduct that are inconsistent with the claimed character trait. *See* Fed. R. Evid. 405(a) ("On cross-examination of the character witness, the court may allow inquiry into relevant specific instances of the person's conduct.").

By operation of these rules, evidence of any award, positive evaluation, or good act supporting a character witness's perception of the defendant as a good officer is inadmissible. *See United States v. Goldfarb*, 643 F.2d 422, 434 (6th Cir. 1981) (district court properly excluded

---

not have a blank check to introduce wide-ranging evidence of good character – even in the form of reputation or opinion testimony—as such generalized information about character is not relevant to the charges in this case, for which general good character is neither an element nor a defense. Thus, the defendant's character evidence should be limited to reputation or opinion testimony about his law-abiding character.

[3] Rule 405(b)'s "essential element" exception does not apply in this case, as the defendant's character is not an element of the crime charged in either count of the indictment or of any defense. Therefore, in this case, any evidence of specific instances of good conduct by the defendant is inadmissible. *See United States v. Hazelwood*, 979 F.3d 398, 410 (6th Cir. 2020) ("Where, as in this case, character is not an 'essential element' of a charge or defense, Rule 405 allows inquiry into prior acts *only* through testimony about a defendant's 'reputation' or 'opinion' to prove a person's character.").

evidence of defendant's "gallantry as an officer and pilot, his two tours in Vietnam and his communications with the White House"); *United States v. Navedo-Ramirez*, 781 F.3d 563, 569 (1st Cir. 2015) (affirming exclusion of defendant-officer's performance evaluations, reasoning that "the character trait that the evaluations purport to show—general competence at her job as a police officer" was not pertinent to the charges); *United States v. Washington*, 106 F.3d 983, 999–1000 (D.C. Cir. 1997) (per curiam) (holding that the trial court properly excluded evidence of a defendant-officer's awards and commendations); *United States v. Nazzaro*, 889 F.2d 1158, 1168 (1st Cir. 1990) (holding that the trial court properly excluded evidence of a defendant-officer's awards and commendations); *United States v. Warren*, No. 10-154, 2010 WL 4668345, at *3 (E.D. La. Nov. 4, 2010) (excluding evidence of a defendant-officer's rescue missions during Hurricane Katrina as "inadmissible evidence of specific instances of conduct"); *United States v. Brown*, 503 F. Supp. 2d 239, 243 (D.D.C. 2007) (excluding evidence of a defendant-officer's commendations because they are "neither opinion nor reputation testimony and accordingly are more akin to specific instances of conduct" barred by Rule 405); *see also United States v. Graham*, 981 F.3d 1254, 1264 (11th Cir. 2020) ("[E]vidence of good conduct is not admissible to negate criminal intent.") (quotation and citation omitted).

**2. Evidence of the victims' character is inadmissible except as it relates to a witness's character for truthfulness.**

Evidence of a victim's character should not be permitted, except as relevant to a testifying victim's character for truthfulness. As with character evidence of the defendant, Rule 404 prohibits character evidence to show that a victim acted in conformity with their character unless a character trait is "pertinent" to the issues in this case. Unless a victim testifies—putting their character for truthfulness at issue—none of the victims' traits are "pertinent" to the defendant's decision to fire

into the windows of Ms. Taylor's apartment. Indeed, evidence of the victims' character is irrelevant because it was not known to the defendant at the time of the shooting and therefore could not have affected the defendant's state of mind at the moment he chose to use force.

Even if a victim's character trait were pertinent (such as a testifying victim's character for truthfulness or untruthfulness), evidence of that trait would be limited to evidence in the form of reputation or opinion testimony. Fed. R. Evid. 405(a). Additionally, if the defendant offers evidence of a victim's character trait, the government may offer evidence to rebut the defendant's evidence and offer evidence of the defendant's same trait. Fed. R. Evid. 404(a)(2)(B).

Regardless of whether a victim testifies, Rule 404 specifically precludes the admission of evidence of other crimes, wrongs, or acts "to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). As with character evidence of the defendant, the rule allows for the introduction of specific act evidence only when it is offered "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id*. None of these categories apply to the victims in this case, innocent civilians who were inside apartments when the defendant fired rounds into their homes. Consequently, the defendant may not introduce evidence about or otherwise refer to purported bad acts committed by the victims in this case.

### C. Evidence of LMPD's policies, procedures, and training on use of force is admissible to prove that the defendant acted willfully.

The United States expects to introduce evidence of LMPD's policies, procedures, and practices relating to officers' use of force, as well as evidence of the training the defendant received on using force, including deadly force. This evidence may include testimony from trainers, supervisors, and other officers who are familiar with LMPD's policies, training, and standards of

conduct, as well as records documenting the training the defendant received, LMPD policy and procedure manuals, and materials used to train officers on use of force principles.  This evidence is admissible for the purpose of establishing that the defendant's use of excessive force was "willful"––an essential element of the crimes charged in the indictment.

The statute charged in both counts of the indictment, 18 U.S.C. § 242, makes it a crime for any person acting under color of law to "willfully" deprive a person of a constitutional right.  To violate the statute, an officer must act "in open defiance or in reckless disregard" of a clearly established constitutional right—an officer who uses excessive force unwittingly or negligently does not violate § 242.  *Screws*, 325 U.S. at 105; *see also United States v. Couch*, 59 F.3d 171 (6th Cir. 1995) (explaining that, if an officer "specifically intends to use more force than is reasonable under the circumstances, he acts willfully and thus runs afoul of § 242").

Evidence that the defendant was properly advised of use of force standards through training and policy is relevant to proving that he acted willfully.  Courts regularly admit such evidence in excessive force cases to prove willfulness because it demonstrates that a defendant was aware of the rules regarding use of force and consciously chose to ignore them.  *See United States v. Wilson*, 344 F. App'x 134, 137 n.3 (6th Cir. 2009) (highlighting, in § 242 prosecution, the "extensive testimony about the officers' training regarding the use of force against inmates"); *United States v. Proano*, 912 F.3d 431, 442 (7th Cir. 2019) ("If, as here, an officer has been trained that officers should not do several things when confronted with tense situations, yet he does those things anyway, the fact that he broke from his training could make it more likely that he acted willfully."); *United States v. Brown*, 654 F. App'x 896, 904 (10th Cir. 2016) (explaining that evidence of defendant-officers' training "was admitted to show Defendants' willfulness [under § 242]"); *United States v.*

22

*Rodella*, 804 F.3d 1317, 1338 (10th Cir. 2015) (affirming admission of training evidence, in § 242 prosecution, "to show that [the defendant-officer] knew that his pursuit of [the victim] was unlawful").

This probative value of such evidence is particularly strong here, where the defendant was a detective with nearly 20 years of training and experience as a police officer, during which he had completed advanced courses focusing specifically on the standards for using deadly force. Evidence about the defendant's extensive training shows that the defendant was aware of the standards for using deadly force; this evidence is highly relevant to the jury's consideration of whether he violated those standards willfully.

Although policy and training evidence is highly probative of the issue of willfulness, it may not be used to prove that the defendant's force was constitutionally excessive. Accordingly, when policy and training evidence is offered in an excessive force prosecution to establish an officer's willfulness, courts recommend issuing a cautionary instruction clarifying to the jury that such evidence is relevant to the willfulness element only, and not to the deprivation-of-rights element. *See, e.g.*, *Proano*, 912 F.3d at 440–41; *Rodella*, 804 F.3d at 1338; *Cole v. Bone*, 993 F.2d 1328, 1334 (8th Cir. 1994). The United States has proposed such a jury instruction in this case.

### D. The defendant's out-of-court statements are admissible in the government's case but may not be elicited by the defense.

The defendant has made statements to several potential witnesses about the circumstances of the events charged in the indictment, and he has given two recorded and transcribed accounts of his shooting: a voluntary interview with LMPD's Public Integrity Unit on March 25, 2020; and trial testimony on March 2, 2022, during his prosecution by the Commonwealth of Kentucky for wanton

23

endangerment.  The government may introduce portions of these prior statements in the upcoming federal trial.

When offered by the government, the defendant's prior statements are admissible under the Federal Rules of Evidence as non-hearsay admissions of a party opponent.  *See* Fed. R. Evid. 801(d)(2)(A).  *United States v. Jaffal*, No. 22-3552, 2023 WL 5200430, at \*10 (6th Cir. Aug. 14, 2023) ("A statement is not hearsay if it 'is offered against an opposing party and . . . was made by the party in an individual or representative capacity' . . . . For this reason, [the defendant's] own statements on the recordings are not hearsay."); *United States v. Whitman*, 134 F.3d 373 (6th Cir. 1997) ("[A]ll that is required is that the proffered statement have been made by a party and that it be offered against the party.").  Thus, the defendant's recorded statements are admissible against the defendant when offered by the government.

While the government may introduce portions of these statements at trial as party admissions, it is well-established that the defendant may not offer his own self-serving out-of-court statements into evidence.  When offered by the declarant, such statements constitute inadmissible hearsay because they are offered by, not against, the party to whom the statement is attributable.  Fed. R. Evid. 801(d)(2).  *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) ("Rule 801(d)(2), however, does not extend to a party's attempt to introduce his or her *own* statements through the testimony of other witnesses.").  "If such statements were deemed admissible under Rule 801(d)(2), parties could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *McDaniel*, 398 F.3d at 545; *see also United States v. Cunningham*, 194 F.3d 1186, 1199 (11th Cir. 1999) ("[A] defendant cannot attempt to introduce an exculpatory statement

. . . without subjecting himself to cross-examination."); *United States v. Kimball*, 15 F.3d 54, 55–56 (5th Cir. 1994) ("A defendant seeking to testify and make exculpatory statements must face cross-examination.  That is a basic rule of our adversary system.").

The defendant likewise may not admit his own statements by asking about them during the cross-examination of government witnesses or during the direct examination of defense witnesses. *See McDaniel*, 398 F.3d at 545–46 ("Whereas Rule 801(d)(2) authorized the Government to question [a witness] on direct examination regarding statements made by [the defendant] because of [the defendant's] status as a party-opponent, any testimony by [the witness] on cross-examination by [defense] counsel regarding additional statements made by [the defendant] that had not already been introduced on direct examination would have constituted inadmissible hearsay that would have effectively allowed [the defendant] to testify without being under oath, without cross-examination, and without direct scrutiny by the jury."); *see also United States v. Ford*, 761 F.3d 641, 651 (6th Cir. 2014) ("On cross-examination, [the defendant] attempted to elicit testimony regarding his exculpatory out-of-court statements, but the district court sustained the government's objections to these questions on the basis of hearsay" and did not abuse its discretion in doing so).  Thus, if the defendant wants to present his version of events, he must take the witness stand, swear an oath, and subject himself to cross-examination.

The Rule of Completeness provides a limited exception to these principles.  This common law doctrine is codified in Federal Rule of Evidence 106, which states that, "if a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction . . . of any other part . . . that in fairness ought to be considered at the same time." *Id*.  Even where Rule 106 applies, it does not give a defendant the unlimited right to introduce other portions of his

recorded statements.    Rather, the rule is a narrow exception designed to avoid misleading impressions created by taking matters out of context and ensure fairness in situations where correcting such misleading impressions can only be done by introducing the additional out-of-court statements.    Indeed, "[t]he doctrine of completeness . . . 'does not make inadmissible evidence admissible,' nor does it allow for the admission of other parts of the statement unless it is 'truly necessary to correct a misleading impression' resulting from the incomplete admitted portions." *United States v. Donnell*, 2022 WL 10219848, at *4 (6th Cir. 2022) (quoting *United States v. Crosgrove*, 637 F.3d 646, 661 (6th Cir. 2011)) (concluding that "[t]he district court did not abuse its discretion in admitting only portions of [the defendant's] jail calls"); *United States v. Gallagher*, 57 F. App'x 622, 628 (6th Cir. 2003) ("The trial court properly concluded that the admitted part of [the defendant's] statement . . . did not require [his] additional self-serving exculpatory comments for completeness . . . [the] self-serving sections of his statement were inadmissible hearsay unaffected by Rule 106.").    Absent the need to correct a misleading impression, the Rule of Completeness does not allow the defendant to admit his own statements and circumvent the adversarial process.

**V.    Statement of Trial Problems or Other Issues**

As the Court is aware, there is a pending motion from the defense seeking to take the jury to view the scene of the defendant's shooting.  ECF No. 40.  The United States filed a response opposing this request because critical parts of the scene appear different now than they did on the night of the defendant's shooting; because a visit is unnecessary in light of the extensive video and photographic evidence of how the scene appeared at the time of the shooting; and because a site

visit would needlessly disrupt trial and create safety risks for the Court, jurors, and attorneys.  *See*

ECF No. 41.  The United States is not aware of any other trial problems or issues at this time.

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General


/s Michael J. Songer
Michael J. Songer
Special Litigation Counsel
Criminal Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-3204
Michael.Songer@usdoj.gov

/s Anna Gotfryd
Anna Gotfryd
Trial Attorney
Criminal Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-3204
Anna.Gotfryd@usdoj.gov

Authority Conferred by 28 U.S.C. § 515

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 13, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a Notice of Electronic Filing to all parties.

*s/ Michael J. Songer*
Michael J. Songer
Civil Rights Division
